UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEBRASKA

S. V., a minor, by and through her general
guardian, Rachel Yamamoto,

     Plaintiff,

v.

UNITED STATES OF AMERICA.

     Defendant.

Case No.  <u>8:16-cv-419</u>

**COMPLAINT FOR
DAMAGES**

## <u>NATURE OF THE ACTION</u>

1.    On April 16, 2014, Plaintiff, a U.S. citizen born in the State of Florida, at the tender age of fourteen, was negligently, wrongfully, and unlawfully arrested, interrogated, and detained for 44 days (including at least one horrific overnight stay in a squalid and frigid cell without a bed or proper nutrition, a cell she describes as an "Icebox") by agents and/or employees of Defendant.  Defendant's agents/employees then initiated removal proceedings against this child, despite the Florida birth certificate she offered demonstrating that she was a U.S. citizen.  For 340 days, almost a full year, Defendant's agents/employees prosecuted removal proceedings against her, unlawfully disregarding her claim of U.S. citizenship and the credible evidence supporting this claim.

2.    Defendant's agents/employees unequivocally breached their duty to this child through their negligence which resulted in a loss of her liberty without due process as well as psychological and emotional harm.  Defendant's agents and employees, who are investigative or law enforcement officers, through their wrongful acts and omissions, carried out within the

1

official scope of their office or employment, committed the torts of assault and battery, malicious prosecution, abuse of process, false arrest/imprisonment, and intentional infliction of emotional distress, actionable under the laws of Texas.

3.      The failure of Defendant's agents and employees to expeditiously and carefully investigate S.V.'s claim to citizenship is a violation of law and the agency's internal guidelines. A 2009 memorandum from John Morton, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement (ICE), to all Field Office Directors, Special Agents in Charge, and Chief Counsels of ICE requires that claims to U.S. citizenship "receive *immediate and careful* investigation and analysis." (emphasis added).[1]  The memorandum requires the agency's "officers, agents, and attorneys … [to] handle these matters *with the utmost care and highest priority*" because "[a]s a matter of law, *ICE cannot assert its civil immigration enforcement authority to arrest and/or detain* a US [citizen]."  *Id.*  (emphasis added). Accordingly, "[i]f evidence indicates the individual is a US [citizen], *ICE should neither arrest nor place the individual in removal proceedings*" and that "*any uncertainty* about whether the evidence is probative of U.S. citizenship *should weigh against detention.*"  *Id.*  (emphasis added). The memorandum also provides that "[a]gents and officers *must* fully investigate the merits of any claim to citizenship made by an individual who is subject to a Notice to Appear (NTA)" and that "[s]uch investigations should be prioritized." *Id.*  (emphasis added).  Additionally, "[i]f an individual already in custody claims to be a US [citizen], an officer *must immediately* examine the merits of the claim and notify and consult with his or her local [DHS counsel]."  *Id.*

---

[1]      Memorandum from John Morton, Assistant Sec'y of Homeland Sec. for ICE, "Superseding Guidance on Reporting and Investigating Claims to United States Citizenship," at 1 (Nov. 19, 2009), *available at* http://www.ice.gov/doclib/detention-reform/pdf/usc_guidance_nov_2009.pdf (Morton Memo).

(emphasis added). An official "memorandum examining the claim" should be submitted to ICE headquarters "no more than 24 hours from the time the individual made the claim" to U.S. citizenship absent "extraordinary circumstances;" and an official response from headquarters is then due "within 24 hours" of receipt of the examining memorandum. *Id.* (emphasis added). In addition to a thorough interview with the individual claiming U.S. citizenship, other safeguards "include *vital records searches*, *family interviews*, and other appropriate investigative measure." *Id.* (emphasis added). Defendant's agents and employees utterly failed to follow these policies with respect to their treatment of Plaintiff.

4.      Because of the unlawful and unconscionable actions of Defendant's agents and employees in violation of law and policy, Plaintiff, now a 17-years-old child, brings this case pursuant to the Federal Tort Claims Act (FTCA) by and through her general guardian and/or next friend, Rachel Yamamoto, Esq. *See* 28 U.S.C. §§ 1346(b) and 2671 *et seq.*; Fed. R. Civ. P. 17(c).

## JURISDICTION

5.      This action arises under the Constitution and laws of the United States, including the FTCA. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question statute) and 1346(b)(1) (United States as a defendant).

## EXHAUSTION

6.      Pursuant to 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.2, Plaintiff, by and through her attorney and guardian, submitted an administrative tort claim on October 14, 2015, to four agencies of Defendant, the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and the U.S. Department of Health and Human Services ("DHHS"). CBP mailed a notice of final denial of

Plaintiff's claim on March 4, 2016. DHHS mailed a notice on July 6, 2016, that Plaintiff's "claim is being closed without determination from this office based on a previous denial of the same claim … on March 4, 2016." None of the other agencies responded. Plaintiff has therefore exhausted her administrative remedies and is filing this timely complaint within six months of the denial of her administrative claim in accordance with the FTCA. 28 U.S.C. § 2401(b), 2675(a).

## VENUE

7.      Venue lies in this Court under 28 U.S.C. § 1402(b) as Plaintiff resides in Omaha, Nebraska, which is within the jurisdiction of this court. In addition, a substantial part of the events or omissions giving rise to this complaint occurred or continued in Omaha, Nebraska.

## PARTIES

8.      Plaintiff, S.V.[2] is a citizen of the United States of America. On September 23, 2015, Rachel Yamamoto, Esq. was appointed as general guardian of S.V. by a Nebraska Douglas County Court Judge. S.V.'s parents remain in Guatemala.

9.      Defendant United States of America (Defendant or United States) is a sovereign sued under the FTCA, under which the United States has waived its sovereign immunity for claims of negligence, assault and battery, malicious prosecution, abuse of process, false arrest/imprisonment, and intentional infliction of emotional distress arising from the wrongful acts or omissions of its agents or employees, including those within DHS, ICE, CBP, and DHHS.

---

[2] To protect the privacy of the child Plaintiff in this case, this complaint refers to her using her initials. *See* Fed. R. Civ. P. 5.2(a)(2)-(3). For the same reason, this complaint also does not provide as much detail as is available concerning the harms she experienced in Guatemala and during her journey to the U.S.

## FACTUAL ALLEGATIONS

**S.V.'s Citizenship Status and Background:**

10.    S.V. was born in Lee County, Florida, the United States of America in 1999, to Micaela L. and Mateo V.  S.V.'s parents are citizens of Guatemala.

11.    Under the Fourteenth Amendment to the U.S. Constitution, S.V. is a natural born U.S. citizen.  *See also* 8 U.S.C. § 1401(a).

12.    S.V.'s birth certificate was filed with the Florida State Office of Vital Statistics on June 2, 1999.

13.    S.V.'s family only stayed in Florida for a short while after she was born.  When she was still very young, her parents returned to Guatemala, bringing her with them.

14.    At some time before she turned three-years-old, her parents –fearing that the Guatemalan government might try to take her away because she had been born in the United States– changed her name with the Civil Registry of Persons in the Municipality of San Juan Ixcoy to Maria Mercedes V. L., wherein they also falsely claimed that S.V. had been born in Guatemala.

15.    In 2002, when S.V. was only three-years-old, her parents left her with her grandmother in Guatemala and returned to the U.S.  When she was old enough, her grandmother enrolled her in school.

16.    At some point thereafter, her uncle and grandfather went to the Civil Registry of Persons in Guatemalan to have S.V.'s name officially changed back to her real name, to wit, S.V. When the Guatemalan authorities learned that S.V. wasn't actually born in Guatemala, they issued significant fines to her parents.

17.     In 2008 or 2009, her parents returned to Guatemala.  At that time, S.V. resumed living with them.  However, her living conditions were not good; her father did not allow her to continue attending school and the family was very poor.  S.V.'s father used to tell her that she could not got to school, lest she end up pregnant.  Instead of education, her father made her go to work in the fields.

**Trip to the U.S. and Arrest by U.S. Border Patrol:**

18.     In 2014, S.V. and her seventeen-year-old sister, Candelaria V. L., traveled together to the United States, with the intention of joining an older sister, Anna Marina V. Velasquez, who resided in Nebraska.  They moved partly in response to rising violence in Guatemala.  Indeed, in 2014 Guatemala's per capita murder rate became the fifth highest in the world.  Additionally, S.V. wanted to be able to study, but she knew her father would not allow it if she remained in Guatemala.  She thus decided that she had to return to the country of her birth, the United States.

19.     She and her sister, unaccompanied by their parents, left Guatemala on or about April 11, 2014, on what proved to be a difficult and harrowing journey to the United States.

20.     On or about April 16, 2014, they crossed the U.S. border.  S.V. intended to present herself to U.S. officials and show them her Florida birth certificate evidencing her U.S. citizenship, as her parents had instructed her to do.  After crossing, she encountered a U.S. Customs and Border Protection (CBP) official, an employee of the Department of Homeland Security, in or around Hidalgo, Texas, and presented copies of documents supporting her claim to U.S. citizenship, including her Florida birth certificate and information related to the hospital in Florida where she was born.

21.     Disregarding her Florida birth certificate and other corroborating documents, CBP officials arrested her, handcuffed her, separated her from her sister, and placed her —a fourteen-year-old—in a holding cell with unrelated and unknown adult men and women, in violation of federal regulations relating to minimum standards for facilities where juveniles are detained.  *See* 6 C.F.R. §115.114(a) ("Juveniles shall be detained in the least restrictive setting appropriate to the juvenile's age…"); (b) ("Unaccompanied juveniles shall generally be held separately from [unrelated] adult detainees.").  CBP officials confiscated her documents and did not return them.

22.     She was later taken out of the cell to be interrogated by a CBP agent.  During this interrogation, S.V. again asserted that she was born in Florida and was a U.S. citizen.  The U.S. official questioning her doubted her claims.  He became very aggressive and began yelling at her and threatening her that she would be thrown in prison for thirty-six years for lying.  S.V. was terrified.  She explained that her parents had registered her under a different name in Guatemala, Maria Mercedes V.L., but maintained that she was born in Florida, and that her real name was S.V.  She told them she did not understand why exactly her parents had registered her under the other name.  She swore that she was telling the truth.

23.     The U.S. border officials did not believe her or investigate her U.S. citizenship claim and expressed doubt over whether she was really S.V.  Instead, they suggested her name might actually be Maria Mercedes V. L.  Though S.V. tried to explain what had happened, how her parents had registered her under that fake name when she was a baby, U.S. border officials did not believe her, or at a minimum were uncertain.

24.     U.S. border officials told S.V. that she would have to go to Immigration Court so that an Immigration Judge could decide whether she was a U.S. citizen.

7

**Unlawful Detention:**

25.     U.S. border officials intentionally and willfully arrested, detained, and transferred S.V. to a detention facility near Hidalgo, Texas to be held overnight.

26.     The holding cell where S.V. was kept on the first night of her detention, on or about April 16, 2014, was extremely cold. S.V., along with the other girls held therein, referred to these holding cells as *hieleras*, or "Iceboxes."

27.     She was also extremely hungry while in detention, having been given insufficient food after being taken into custody.  She could not sleep at all during the night, even though she was exhausted.  There was no bed or mattress provided to her.  There were only benches and concrete floors.  Border official took her jacket from her, leaving her with just a t-shirt to keep warm.  She tried to sleep, but shivered throughout the night.  At one point, a U.S. official asked the girls in the cell if they were cold.  Everyone said they were.  She believes the official then made the cell even colder.

28.     This detention facility cell was also squalid.  Toilets were in the holding cell, but were very filthy.  The air was filled with the stench of human feces.  Used toilet paper laid all over the floor.  The cell was crowded.  The lights remained on throughout the night.   She had trouble keeping track of time.  She is not sure how long exactly she was held there, but it was at least overnight.  This facility also failed to comply with federal regulations relating to minimum standards for facilities where juveniles are detained.  *See* 6 C.F.R. §115.114(a).

29.     S.V. did not consent to Defendant's agents' actions.  Defendant's agents were without authority of law to arrest and detain S.V. under immigration law, as she is a U.S. citizen.

30.     Indeed, as a matter of law, "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."  18 U.S.C. § 4001(a).

Neither the Immigration and Nationality Act not DHS policy authorizes detention of a U.S. citizen by immigration officers. *See* 8 U.S.C. § 1101 et seq.; Morton Memo, at 1.

31.     Yet, on or about April 17, 2014, officers within DHS issued a warrant for S.V.'s arrest and continued detention.

32.     At some point after being detained in the "Icebox," she was processed in Weslaco, Texas and then transferred to a juvenile detention facility located at 32120 FM1847 Los Fresnos, Texas, 78566. This facility is maintained by the Office of Refugee Resettlement, a component of the U.S. Department of Health and Human Services. It was here that she was finally reunited with her sister.

33.     Upon information and belief, copies of S.V.'s documents related to her U.S. citizenship, including her Florida birth certificate, were provided to DHHS.

**Initiation of Immigration Removal (Deportation) Proceedings:**

34.     On April 17, 2014, officials issued a Notice To Appear (NTA), the charging document that DHS officials use to initiate removal proceedings before an Immigration Judge. The NTA charged S.V. as not being a citizen of the United States and instead being a citizen of Guatemala, and alleged that she was subject to removal from the United States as a noncitizen.

35.     She was then forced to appear without legal counsel in Immigration Court in Harlingen, Texas on April 21, 2015. The government was represented by a trained DHS attorney. The experience of being forced to appear in Immigration Court without an attorney was terrifying for S.V. because she feared she was going to be deported out of the U.S. back to the country from which she had just fled.

36.     S.V. remained in federal custody in Texas until May 29, 2014, for a total of 44 days in a U.S. detention facilities maintained by CBP and DHHS. To both DHS and DHHS

officials, she indicated that she is a U.S. citizen born in Florida. Throughout her detention, she estimates that she told U.S. officials who had custody of her at least seven different times that she is a U.S. citizen born in Florida.

37.    Indeed, she did not understand why, as a U.S. citizen, she was being held in detention for so long. She was very afraid during the entire time she was held in detention.

38.    The forms that DHS agents completed in connection with her arrest and processing for removal proceedings —while internally inconsistent, contradictory, and erroneous in several places— clearly indicate that S.V. unequivocally asserted to be a U.S. citizen to U.S. border officials from the moment she first came in contact with them on or about April 16, 2014.

39.    Yet, U.S. officials negligently failed to take S.V.'s claim to U.S. citizenship seriously. S.V. presented them with a copy of her Florida birth certificate. Defendant's agents had no discretion to disregard her assertion of U.S, citizenship. However, U.S. officials failed to take the appropriate steps that are required when a detained individual asserts that she is a U.S. citizen.

40.    S.V. notified U.S. officials during her interrogation on April 16 or 17, that she had an adult sister, Anna Marina V. Velasquez, living in Omaha, Nebraska and she gave them that sister's phone number.

41.    When U.S. officials contacted Anna Marina V. Velasquez, Anna affirmed that S.V. was born in Florida.   U.S. officials responded by telling Anna that if she was lying she would be thrown in prison, and otherwise disregarded that information.

42.    Despite S.V.'s assertions and cooperativeness during the interrogation, Defendant's agents failed to adequately and expeditiously consider and investigate this child's

claim to U.S. citizenship.  Instead, S.V. was simply presumed to be a noncitizen in light of the U.S. officials' uncertainty with regard to the documents she presented.

43.     The documents S.V. provided Defendant's agents and employees were probative evidence indicating she is a U.S. citizen.  Thus, under the Morten Memo, she should not have been arrested, detained, or placed in removal proceedings.  Indeed, the Morten Memo provides that "[i]n all cases, any uncertainty about whether the evidence is probative of U.S. citizenship should weigh against detention."

44.     The U.S. Supreme Court has held that immigration authorities have the burden of establishing alienage by "clear, unequivocal, and convincing evidence."  *Woodby v. INS*, 385 U.S. 276, 277 (1966); 8 C.F.R. § 1240.8(c).  Defendant's agents and employees did not meet this high burden, nor did they possess sufficient evidence to even initiate removal proceedings against S.V.

45.     The U.S. officials that arrested, detained, and initiated removal proceedings against S.V. owed her a duty to exercise due care and fully, properly, carefully, and expeditiously investigate, consider, and analyze her credible and corroborated claim to U.S. citizenship.  Through the actions and omissions of its agents and employees, Defendant breached its duty to S.V. by utterly failing to exercise due care and give due consideration to her statements and the credible documents she provided related to her U.S. citizenship, and by violating their own internal policies.

46.     Had U.S. officials followed their own policies or simply exercised the care of a reasonably prudent person charged with enforcing U.S. immigration law to promptly and properly investigate S.V.'s claim to U.S. citizenship, S.V.'s rights and liberty interests would not have been violated.

11

47.     Employees of CBP and DHHS, in particular, voluntarily assumed, in light of their knowledge that S.V. was a child, the actual care and custody of S.V., and thus stood *in loco parentis*.  As such, they had an affirmative and heightened obligation to adequately investigate S.V.'s claim to U.S. citizenship and to protect S.V. from unlawful arrest, detention, and unnecessary separation from her family.

48.     The negligence of Defendant's agents and employees proximately caused S.V.'s damages in that it was extremely foreseeable that S.V. would be unlawfully, arrested, detained, and subject to removal proceedings if her credible claim to U.S. citizenship was not properly considered.

**Release from Detention and Ongoing Removal Proceedings:**

49.     After being held in a juvenile detention facility for approximately a month and a half, S.V. was released to her sister, Ana Marina V. Velasquez, who lives in Omaha, Nebraska.

50.     The removal proceedings, which started in Harlingen, Texas, were then transferred to the Omaha Immigration Court on June 18, 2014.

51.     On June 17, 2014, S.V. consulted with staff attorney, Virginia Maynes, of the non-profit organization, Justice for Our Neighbors-Nebraska ("JFON-NE").  JFON-NE accepted S.V.'s case *pro bono* and Ms. Maynes filed her appearance in S.V.'s immigration removal proceedings on August 4, 2014, at the Omaha Immigration Court, located at 1717 Avenue H, Omaha, NE 68110.

52.     At S.V.'s first immigration court hearing on August 25, 2014, Ms. Maynes notified counsel for DHS, and the Immigration Court that S.V. was a U.S. citizen and that proceedings should be terminated.  The Omaha Immigration Judge presiding did not terminate the case and instead instructed Ms. Maynes to speak with opposing counsel.  The Judge then

reset the case for April 21, 2015.  DHS counsel incorrectly asserted at the August 25 hearing that S.V. needed to file immigration Form N-600 at the next hearing.

53.    A Form N-600 is used to apply for documentation of U.S. citizenship by individuals who, under the U.S. nationality laws, gained their citizenship in a manner other than through birth in the United States—for example, by those who are U.S. citizens because they were born abroad to a U.S. citizen parent, or who obtained their citizenship automatically at some point after birth, but before reaching the age of 18, by virtue of the naturalization of one or both parents.  The Form N-600 is not used by individuals who were born in the U.S. Moreover, S.V. had no need for proof of her citizenship as she had a U.S. birth certificate.

54.    Ms. Maynes called and spoke with different DHS attorney on September 15, 2014, and again asserted that S.V. is a U.S. citizen.  This DHS attorney instructed Ms. Maynes to call the Deputy Chief Counsel.  She did so on September 15, 2014 and left a message.  Deputy Chief Counsel did not return her call.

55.    On February 17, 2015, she then sent a formal request to DHS, along with copies of S.V.'s extensive proof of citizenship and identity, to join in S.V.'s motion to terminate immigration removal proceedings.

56.    Having received no response from DHS by March 4, 2015, Ms. Maynes called and spoke with yet another DHS attorney, who indicated that DHS would not join in a motion to terminate removal proceedings and again incorrectly suggested S.V. should file an N-600.  Mr. Maynes insisted that an N-600 was not necessary. In response, DHS counsel indicated she might try to change venue back to Texas because U.S. officials there felt they had enough evidence to place S.V. in proceedings.  But, DHS counsel also indicated she would "take another look at [the case]."

13

57.     Having received no word back from DHS by March 12, 2015, Ms. Maynes filed a written motion to the Immigration Judge to terminate removal proceedings based upon S.V.'s U.S. citizenship.  On March 17, 2015, DHS filed a non-opposition motion.  The Immigration Judge granted the motion to terminate removal proceedings on March 23, 2015, explicitly finding that S.V. is a U.S. citizen.  The order was entered less than one month before S.V.'s one-year anniversary of having been arrested by CBP.

58.     S.V. was negligently, wrongfully, and unlawfully arrested, interrogated, detained for 44 days (including at least one horrific overnight stay in the "Icebox"), and subject to removal proceedings—with the threat of eventual deportation should she lose— for nearly one year before her removal proceedings were finally terminated, and she was recognized as a U.S. citizen.  As such, Defendant's agents acting within the official scope of their office or employment, breached their duty to this child through their negligence, including both wrongful acts and omissions, proximately causing her loss of liberty as well as psychological and emotional damages.  The foregoing constitutes the tort of negligence and violates the common law duty to protect under Texas law.

59.     Additionally, agents and employees of DHS —including both CBP and ICE agents/employees— who at all relevant times were "investigative or law enforcement officers" within the meaning of 28 U.S.C. § 2680(h), committed the torts of assault and battery, malicious prosecution, abuse of process, false arrest, and false imprisonment against Plaintiff under Texas law.

60.     Finally, Defendant's agents and employees also committed the tort of intentional infliction of emotional distress under Texas law.

61.     None of the tortious actions by Defendant's agents and employees described above were discretionary functions or duties of the agencies.

62.     The Morten Memo provides that for an individual in custody who claims to be a U.S. citizen, the government has 48 hours from the time of the individual's claim to evaluate it —24 hours to prepare and submit a memorandum "examining the claim and recommending a course of action" and 24 hours to make a decision on the recommendation.  Upon information and belief, S.V.'s claim did not receive such treatment.  Rather, it took nearly one year before Defendant's agents and employees properly examined this child's claim to U.S. citizenship.  When they finally did conduct the required examination, S.V.'s claim was found to be valid.

63.     As a proximate cause of the above tortious actions, S.V., a mere child, sustained psychological and emotional injuries, including severe emotional distress, all in addition to a loss of her liberty, which included physical confinement for 44 days, including at least one horrific overnight detention in the "Icebox," and threatened deportation and removal that lasted for nearly 1 year.

64.     Taken together, the intentional or reckless conduct of Defendant's agents and employees was "extreme and outrageous."

65.     The conduct of Defendant's agents and employees also reveals a perverted use of the process, neither warranted nor authorized, and improper motives, all of which resulted in damages to S.V.

66.     Since coming through this harrowing experience, S.V. has expressed suicidal ideations.

## CAUSES OF ACTION

### COUNT I
### FTCA – Negligence

67.     Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

68.     The actions of Defendant's agents and employees constitute the tort of negligence under the laws of Texas in that Defendant owed a duty to Plaintiff, breached that duty, and, as such, was a direct and proximate cause and a substantial factor in bringing about Plaintiff's damages outlined above.  *See Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987).

69.     Defendant's agents and employees have a duty to act with reasonable care in exercising its civil arrest and detention authority, including investigating citizenship status prior to deciding to arrest a child, and expeditiously and adequately investigating claims of U.S. citizenship made by children in its custody.

70.     Defendant's agents and employees breached this duty to S.V. when it arrested, detained, and subjected her to removal proceedings—with the threat of eventual deportation should she lose—for nearly one year before her removal proceedings were finally terminated, and she was recognized as a U.S. citizen, all without an adequate and expeditious investigation of her credible U.S. citizenship claim.

71.     This breach by Defendant's agents and employees' actually and proximately caused S.V.'s arrest, prolonged detention, near one-year threat of deportation, and related damages of emotional distress.

72.     Under the Federal Tort Claims Act, Defendant United States of America is liable

for these actions and omissions.

## COUNT II
## FTCA – Common Law Duty To Protect

73.     Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

74.     Defendant's agents and employees of DHS, CBP, and DHHS were aware of Plaintiff's particular status or unique situation, as a child, and voluntarily assumed, in light of that knowledge, the actual care and custody of Plaintiff and thus stood *in loco parentis*.  As such, Defendant's agents and employees had further affirmative obligations to adequately investigate Plaintiff's claim to U.S. citizenship and to protect Plaintiff from unlawful arrest, detention, threatened deportation, and separation from her family. *See e.g., Coons-Anderson v. Anderson*, 104 S.W.3d 630, 635-36 (Tex.App. -Dallas 2003).

75.     The foregoing actions of Defendant, which constitute a violation of the common law duty to protect under the laws of Texas, proximately caused Plaintiff's damages outlined above.

76.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

## COUNT III
## FTCA – False Imprisonment/False Arrest

77.     Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

78.     The actions of Defendant's agents and employees constitute the torts of false imprisonment and false arrest under the laws of Texas in that they (1) willfully detained Plaintiff; (2) without her consent; and (3) without authority of law. *See Wal-Mart Stories, Inc. v. Rodriguez,*

92 S.W.3d 502, 506 (Tex. 2002); *Villegas v. Grifin Indus*., 975 S.W.2d 745, 754 (Tex.App.1998); *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 376 (Tex.1985); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995).  The foregoing actions of Defendant's agents and employees proximately caused Plaintiff's damages outlined above.

79.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

### COUNT IV
### FTCA – Malicious Prosecution

80.     Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

81.     Defendant's agents and employees maliciously initiated removal proceedings against Plaintiff, a U.S. citizen, for an improper purpose, and without sufficient proof of alienage, contrary to her credible claims to U.S. citizenship, until those proceedings were favorably terminated for Plaintiff.  *See e.g., Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) ("[T]he tort of malicious prosecution … signifies … initiation of charges [against an innocent person] without probable cause" if "the proceedings terminate favorably for the person thus prosecuted."); *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex. 1996); *RRR Farms, Ltd. v. American Horse Protection Ass'n, Inc.*, 957 S.W.2d 121 (Tex. App. -Houston [14th Dist.] 1997) (Listing the six elements of the tort of malicious prosecution as: "(1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5) termination of the proceeding in plaintiff's favor; and (6) special damages.")  The foregoing actions of Defendants proximately caused Plaintiff's damages outlined above.

82.     The actions of Defendant's agents and employees constitute a violation of the

common law tort of malicious prosecution under the laws of Texas.

83.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

### COUNT V
### FTCA – Abuse of Process

84.    Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

85.    Defendant's agents and employees illegally initiated immigration removal proceedings against Plaintiff, a U.S. citizen, for an improper purpose and with improper motives, without proof of alienage, contrary to her credible claims to U.S. citizenship. *See  RRR Farms, Ltd. v. American Horse Protection Ass'n, Inc.*, 957 S.W.2d 121 (Tex. App. -Houston [14th Dist.] 1997) (Listing the three elements of the tort of abuse of process as: "(1) the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act.")  The foregoing actions of Defendant's agents and employees proximately caused Plaintiff's damages outlined above.

86.    The actions of Defendant's agents and employees constitute a violation of the common law tort of abuse of process under the laws of Texas.

87.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

### COUNT VI
### FTCA – Intentional Infliction of Emotional Distress

88.    Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set

forth herein.

89.    Defendant's agents and employees have a duty to act with reasonable care in exercising their arrest and detention authority, including that they will not unlawfully arrest and detain U.S. citizens without probable cause, and will not intentionally inflict emotional distress upon U.S. citizens seeking entry into their country.  Defendant's agents and employees committed the tort of intentional infliction of emotional distress by (1) acting intentionally or recklessly, (2) through conduct that was extreme and outrageous, (3) which caused Plaintiff emotional distress, and (4) that the emotional distress was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993); *Wornick v. Casas*, 856 S.W.2d 732, 734 (Tex.1993); *Danawala v. Houston Lighting & Power Co*., 14 F.3d 251, 256 (5th Cir.1993).

90.    Defendant's agents and employees breached this duty when it presumed Plaintiff to be a noncitizen, arrested, detained, and threatened her with deportation.  The foregoing actions of Defendant's agents and employees proximately caused Plaintiff's damages outlined above.

91.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

## COUNT VII
## FTCA –Assault and Battery

92.    Plaintiff repeats, alleges, and incorporates the foregoing paragraphs as if fully set forth herein.

93.    Defendant's "investigative or law enforcement officer[s]," placed Plaintiff in apprehension of imminent bodily contact while interrogating her, and then unlawfully and physically arrested, handcuffed, and detained her as a noncitizen, such contact being offensive to Plaintiff, a U.S. citizen.  *See City of Watauga v. Gordon*, 434 S.W.3d 586, 589-90 (Tex. 2014) (explaining that "[a]n assault occurs when a person is in apprehension of imminent bodily contact,

whereas a battery is committed when an individual actually sustains a harmful or offensive contact to … her person").

94.    The foregoing actions of Defendant's "investigative or law enforcement officer[s]," constitute the tort of assault and battery under the laws of Texas, and proximately caused Plaintiff's damages outlined above.

95.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, by and through her guardian, respectfully prays that this Court grant the following relief:

1.    Trial by judge on all claims so triable;

2.    Compensatory damages in an amount to be proven at trial;

3.    Costs and reasonable attorney fees in this action as provided by 28 U.S.C. § 2412 or any other provision of law;

4.    The right to conform the pleadings to the proof and evidence presented at trial; and

5.    Such further relief as the Court deems just and equitable.


DATED:  September 2, 2016        By: s/ Charles S.  Ellison
                                 Charles S. Ellison (NE #24873)(NY # 4814232)
                                 NATIONAL JUSTICE FOR OUR NEIGHBORS
                                 By JUSTICE FOR OUR NEIGHBORS-NE
                                 2414 "E" Street
                                 Omaha, NE 68107
                                 Phone: (402) 898-1349
                                 Fax: (402) 502-4604
                                 ATTORNEY FOR PLAINTIFF S.V.